Argued March 10, reversed with instructions March 30, 1955

IN THE MATTER OF THE GUARDIANSHIP OF
ROBIN LEE KARR, A MINOR
WOERNER v. LEROUX ET AL.

281 P. 2d 465

*Frank L. Whitaker,* Portland, argued the cause
and filed briefs for appellant.

*Willis A. West* and *E. Earl Feike,* Portland, argued

[ 1 ]

the cause and filed a brief for respondents Joseph LeRoux and Pearl H. Karr and Nancy K. Russell.

Before TOOZE, Acting Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

LATOURETTE, J.

This is an appeal by Willene B. Woerner, maternal grandmother of Robin Lee Karr, a minor granddaughter, from an order dismissing her petition to be appointed guardian of the person of said minor and from an order appointing Joseph LeRoux as such guardian.

After the marriage of Lee Karr, a former secretary of the Oregon State Bar, to Mary Woerner, they and Mrs. Woerner purchased a house on Willamette Heights where the three of them resided for a period of about three years. About two months before Mary's death, the three moved into a house that Lee had rented in the Irvington district in Portland. Two weeks after Robin was born Mary died and the child was taken to the home in Irvington where Mrs. Woerner cared for her for a period of some nine years, until the untimely death of her son-in-law Lee. Thereupon she petitioned the probate court, presided over by the Honorable Ashby C. Dickson, to be appointed guardian of the person of said child, the Bank of California having theretofore been appointed guardian of the estate of said minor. The paternal grandmother, Pearl H. Karr, and her daughter, Nancy K. Russell, counter-petitioned to have Nancy K. Russell appointed guardian. After proceedings were had the Honorable Virgil H. Langtry, Judge of the Domestic Relations Department in Multnomah county, pursuant to a letter from Judge Dickson asking him to sit in his absence, ap-

pointed Joseph LeRoux, godfather of the child, as personal guardian.

The only sworn testimony we have in the trial of the case is that of the three petitioners, Willene B. Woerner, Pearl H. Karr and Nancy K. Russell. From such evidence we can glean only that, other than the personal feud between the maternal grandmother on one side and the paternal grandmother and her daughter on the other, the maternal grandmother took excellent care of the child during the period of time she has remained with her.

However, before the hearing was had and while Judge Dickson was exercising jurisdiction over the matter, the parties stipulated that "the court make such investigation as to the court might seem proper and desirable in the premises, and that thereupon the matter be set down for hearing at the earliest possible date." Pursuant to such stipulation Judge Dickson directed Elaine R. O'Brien, Juvenile Court Counsel, to make an investigation. She did so and incorporated it in her report which we have before us. From that report it appears that she interviewed 30 persons and it states in part as follows:

"* * * Certainly, Mrs. Woerner was a devoted grandmother to Robin, and nursed her faithfully through several rather serious illnesses during her infancy. Dr. Sam Henricke and Dr. Harold Lucas have both testified to the loving care and solicitude of Mrs. Woerner. Neither feel that she has been over-solicitous, although Dr. Henricke remarked that Robin is an intelligent child who can easily overcome any 'quirks' she may acquire as the result of being an 'only child,' and somewhat indulged.

"* * * The neighborhood, though old, [in the Irvington district] is a substantial one, and offers good recreational facilities for children. Both Mrs.

Woerner and Robin have a good relationship with their neighbors, and are free to come and go in the homes surrounding them. Among the people we interviewed in that area, the consensus was that Robin is receiving the best of care and is a 'dear, sweet child,' well-adjusted, and with beautiful manners. Robin attends Grace Memorial Sunday School.

"* * * * *

"We found Robin to be a very poised and self-possessed young woman, whose actions belied her nine years. She chatted easily with us in a mature manner, and was totally in control of the situation. She was not at home when we arrived but came in soon after. When she learned who we were, she was quite concerned because she was in jeans and blouse, indicating that she would change immediately. We assured her she was quite acceptable as she was, but the matter bothered her, as she referred to it several times before we left. She also chided her grandmother for receiving us dressed in a housecoat rather than a dress.

"* * * * *

"Robin is indeed a beautifully mannered child, and acted the part of hostess superbly. We were unable to sense any of the carefree, casual attitude common to most children her age, but she did not appear to be unhappy or repressed.

"* * * * *

"Without exception, the references given by Mrs. Woener, all of whom we interviewed, were lavish in their praise of her care and rearing of Robin. All felt it would be shameful to remove the child from her. Typical of the comments were, 'She is just like a mother to Robin'; 'she has dedicated her life to that child'; 'to know Mrs. Woerner is like reading a beautiful book,' 'she would kill herself if Robin were taken away from her'; 'why, when she's at my house, she will ask to use the phone to call Mrs. Woerner, telling her where she is, and ending up saying, "I love you, mother dear!"' 'Robin is all she has left in the world', and many others.

"The report of Robin's calling Mrs. Woerner and ending the conversation as noted above, came to us from several persons, all of whom thought it was charming. It was a little disturbing to us in that it denoted an almost excessive emotional tie, and did not appear to be completely normal behavior in a typical carefree nine year old child.

"*     *     *     *     *

"There are many positive factors which would operate to make a success of Robin's continuing placement with her maternal grandmother. Mrs. Woerner is the only mother the child has ever known. She has a strong emotional attachment to her grandmother which would make her adjustment elsewhere precarious. Friends of Mrs. Woerner are very fond of Robin, and she has a happy, secure relationship with them and their children. If Mrs. Woerner would be willing to heal the breach between her and Mrs. Karr, Robin could also have a 'second family,' which would help her adjustment and emotional growth.

"The negative factors are Mrs. Worner's age, her possible overindulgence of her granddaughter, and the fact that Robin is the last one left of her immediate family. The latter factor is potentially dangerous primarily because Mrs. Woerner has suffered such severe deprivation in the loss of those close to her, and might unconsciously make Robin the substitute for the others so that the child's inherent right to independence of thought and action might be endangered.

"*     *     *     *     *"

We find in the files an affidavit of Joseph LeRoux, the child's godfather and the party appointed as guardian of her person. It is in part as follows:

"*  *  * Robin Lee is a very warm, demonstrative little girl; that I feel that the security of her home including her own room and the association of her playmates with whom she has attended school and played is most important in this period of her de-

velopment; that I sincerely feel that to deprive Robin Lee the constant guidance and attention of Mrs. Woerner, who is the only mother she has ever known, will do more to upset the child emotionally than any other course of action could possibly do; * * *''

Judge Langtry's opinion is in part as follows:

"From the time the child was born until the present, she has been cared for by Mrs. Woerner, the maternal grandmother, who is one of the petitioners. The child's father maintained a home for himself, Mrs. Woerner and the child during this period of time. Before the child's mother died, sharp differences between Mrs. Woerner and the Karr side of the family had developed. This condition never became better and apparently became worse as the years went on. Lee Karr, who was a very prominent member of the Bar and Executive Secretary of the Oregon State Bar Association, was apparently a person who disliked controversy with the result that he kept the two sides of the family strictly apart. He maintained his own contacts with his mother and other members of the family but never let them touch Mrs. Woerner or the Woerner side of the family. The Court finds, as a matter of fact, that this was extremely distressing to Mr. Karr, but that it was considered by him to be better than the conflicts which seemed inevitable if the parties were ever brought together. The Court further finds—and this finding may be substantiated by a reference to the testimony and the report of the investigation—that Mrs. Woerner has devoted her time and love unceasingly to the minor child. However, this devotion of Mrs. Woerner to the child, in view of Mrs. Woerner's own sad and distressing emotional crisis of the past, may be described as an overpossessiveness which will be detrimental to the best development of the child. It is apparent that the child is precocious. The investigation disclosed, and the Court's observation bore

this out, that the child displays a maturity considerably beyond her years. Her development has been decidedly different from that which the Court would call natural. In many cases in which this Court has been called upon to talk with children where there is a contest over custody, it has never seen one where the child has been more perfectly prepared for presenting a point of view to the Court. It is easy for the Court to determine under such circumstances when a child has been told what to say to the Judge and it is a little harder to determine when the child has been prepared by subtler means to tell the Judge in his own or her own words the point of view which has been implanted in the child's mind by intention. It was the Court's observation in the instant case that the latter method had been used. The child repeatedly referred to her father's relatives as 'those other people' or 'mean people' and as 'them'. Her attempts to make it appear that her father had tried to teach her that his own relatives were mean became incoherent and it appeared rather that she was repeating something which had been told to her. In any event, it is inconceivable to this Court that a man of Lee Karr's intelligence and nature would have told his child that his own relatives were such as the child attempted to describe to the Court and at the same time maintain a separate friendly relationship with those relatives.

"These observations of the Court, together with the extreme bitterness displayed by both sides in the courtroom, led the Court conclusively to believe that it would be impossible to expect anything except the poisoning of the child's mind 'against the other side' at the present time, if she were left in the physical custody of Mrs. Woerner. The Court is most mindful of the fact that a removal of the child from Mrs. Woerner at the present time will be threatening to the child and that if it is effected it must be done with greatest of care. The alternative of the threatening nature of the removal, however,

would be a further poisoning of the child's mind against her other relatives as well as the damage that could be done to her character through the extension of the extreme over-possessiveness to which she has already been exposed. It seems to the Court that if a break does not come in this unnatural relationship between Mrs. Woerner and the child, that the child will become increasingly an emotional problem and that her future happiness may well be irrevocably impaired. The Court must weigh the threatening nature of a split in the grandmother and child relationship now against this future threat of character impairment to try to do what is in the best interests of the child.  *  *  *''

From the foregoing it is clear that the basis of the court's opinion in depriving Mrs. Woerner of the custody of the child is that she is overpossessive of the child "which will be detrimental to the best development of the child" and that "it would be impossible to expect anything except the poisoning of the child's mind 'against the other side' at the present time, if she were left in the physical custody of Mrs. Woerner.'' Of course, what will happen in the future is mere conjecture. The fact remains that the child has had excellent care over the years that she has been with her grandmother. A mother could have done no better. If overpossessiveness of a child on the part of a grandmother is not a virtue, then most grandmothers could be criticized for overindulging their grandchildren. There is no evidence that the child has as yet suffered from the same. The contrary seems to be true.

As to the animosity between the grandparents and the coaching of the child by Mrs. Woerner in preparation for trial, we share the trial court's disapproval, but, recognizing the frailties of human nature, we can understand the grandmother's maledictions. However, this, in our opinion, is not of compelling consequence

when considering the other evidence in the case, the most persuasive being that Lee had such confidence in Mrs. Woerner that he permitted her to care for his child for over a period of nine years. This cries out louder than most of the unsworn hearsay statements that we have before us. It is inconceivable that a man of Lee Karr's integrity and high sense of responsibility would permit Mrs. Woerner to mother his child for such a length of time if he had the least suspicion that his daughter would suffer thereby, either in mind or body. We can see no good reason for a court, in the present case, to substitute its judgment for that of the child's father.

Reversed with instructions to appoint Willene B. Woerner guardian of the person of Robin Lee Karr.